UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES,

    Plaintiff,

v.                                          Case No. 06-20240
                                            Honorable Patrick J. Duggan

MEHDI VATANI,

    Defendant.
_____/

**OPINION AND ORDER**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on March 14, 2007.

PRESENT:    THE HONORABLE PATRICK J. DUGGAN
                      U.S. DISTRICT COURT JUDGE

Defendant, a Canadian citizen, is charged by way of an indictment with possession with the intent to deliver approximately 41 kilograms of cocaine. The cocaine was seized from the trunk of a rental car Defendant was driving in Sterling Heights, Michigan, on April 4, 2006. Defendant seeks to suppress the cocaine, arguing that officers from the Sterling Heights Police Department lacked probable cause to stop and subsequently search his car. The Court held an evidentiary hearing with respect to Defendant's motion on December 13, 2006. Following the hearing, Defendant and the Government filed supplemental pleadings on January 10 and February 6, 2007, respectively.

**Factual Background**

At some time prior to June 2005, Canadian law enforcement officers obtained evidence suggesting that a group of Canadian residents were trafficking in drugs between Canada and the United States. (12/13/06 Tr. at 63.) The primary target of their investigation, entitled "Project Masdinero," was Salwan Sadiq ("Sadiq"). (*Id*. at 56, 74-75; Def.'s Post Hr'g Mem. Ex. 1 & Ex. 2.) They also uncovered evidence indicating that individuals working with Sadiq were moving the proceeds of the group's drug transactions between the two countries. (12/13/06 Tr. at 63-64.) In fact by June 2005, Canadian authorities had conducted "substantial money seizures" related to the group, including a seizure of over $930,000 in U.S. currency from an individual named Hasad Hamoud. (*Id*.)

The Canadian investigation revealed that the group's illegal activities involved connections in the area of Sterling Heights, Michigan. (*Id*. at 62.) Therefore, in June 2005, Canadian law enforcement officials met with representatives from the Sterling Heights Police Department and the U.S. Drug Enforcement Agency ("DEA"). (*Id*. at 62-63.) George Tsouroullis, a Sterling Heights police detective assigned to the department's narcotics unit and a DEA task force unit in Detroit, attended the meeting. (*Id*.) During the meeting, the Canadian officers briefed the American officers about the Canadian investigation and the seizures already made. (*Id*. at 63.)

Thereafter, Detective Tsouroullis and Miguel Chino– a DEA Special Agent also involved in the investigation on the U.S. side– spoke with the Canadian officers on a

regular basis. (*Id*. at 64.) During these communications, Detective Tsouroullis and Special Agent Chino received information obtained by the Canadian investigators and they passed along information concerning relevant activities in the Sterling Heights area. At some point between June 2005 and January 2006, Detective Tsourillis and Special Agent Chino learned that the Canadian authorities planned and received court approval to conduct a wiretap in Canada to further their investigation. (*Id*. at 65.)

In mid-February 2006, the Canadian authorities advised Detective Tsourillis and Special Agent Chino that they had identified Defendant through telephone intercepts via the Canadian wiretap as a person who was considered to be moving currency into the United States for the targeted drug trafficking organization. (*Id*. at 65-66.) The Canadian authorities further informed Detective Tsourillis and Special Agent Chino that they also suspected Defendant was involved in narcotic activity, although they had not yet determined the level of his activity. (*Id*. at 66.) According to Detective Tsourillis, the Canadian authorities indicated that Defendant resided in Toronto, but that he frequently traveled to the United States. (*Id*.)

In early April 2006, Chris Elliot from the Toronto Police Service Drug Squad informed Special Agent Chino that the Canadian agents had intercepted conversations between Sadiq and Defendant on cellular phones used by Sadiq which suggested that Defendant was at a hotel in the greater Detroit area. (*Id*. at 68-69; Pl.'s Ex. 5.) According to Mr. Elliott, Defendant identified the hotel during the intercepted calls as an AmeriSuites hotel off of Hall Road and Exit 240, across from a Dave and Busters. (*Id*. at

3

71.)  Mr. Elliott further informed Special Agent Chino that the intercepted conversations indicated that Defendant was planning to meet someone at the hotel in order to engage in some type of monetary exchange.  (*Id.* at 69.)

Based on Defendant's description of his location, Detective Tsourillis and Special Agent Chino determined that he was at an AmeriSuites Hotel on Delco Road, off of Hall Road, in Utica.  (*Id.* at 71.)  Mr. Elliott then called the hotel and confirmed that Defendant was a registered guest.  Mr. Elliott also learned from Defendant's hotel registration form that Defendant was driving a rented Grand Prix with a specific license plate number.  (*Id.* at 73.)  Thereafter, on April 3, 2006, Detective Tsourillis and Special Agent Chino assembled a crew of officers at the AmeriSuites Hotel to conduct surveillance of Defendant.  (*Id.* at 72.)

At 6:13 p.m. on April 3, the surveillance team observed a green Chevrolet Impala with Michigan license plates arrive at the hotel.  (Pl.'s Ex. 5.)  The officers then observed Defendant exit the lobby doors of the hotel and enter the passenger side of the Impala.  (*Id.*)  At that point, the Impala was driven to the rear of the hotel and Defendant was observed exiting the vehicle carrying a shopping bag with handles.  (*Id.*)  A short time later, the Canadian officers monitoring the wiretap on Sadiq's phone intercepted conversations between Defendant and Sadiq which indicated that Defendant was waiting for someone to arrive who was bringing him "papers"– i.e. money– that Sadiq needed.  (*Id.*)  The Canadian monitors were conveying the contents of these calls to the American surveillance team.  (*See* 12/13/06 Tr. at 69-71, 74.)

At 12:42 p.m. on the following day, April 4, the surveillance team observed Defendant checking out of the AmeriSuites hotel and placing two bags– a small black camera-type bag and a small, rolling suitcase into the trunk of the Grand Prix. (*Id.* at 74; Pl.'s Ex. 5.) The officers continued to observe Defendant as he drove a short distance to a Marriott hotel that also was located on Delco Road, where he checked-in as a guest. (*Id.*) Approximately one half hour later, at 1:17 p.m., Canadian officers intercepted a telephone call from Defendant on Sadiq's telephone. (*Id.*)

During this telephone conversation, Sadiq told Defendant: "I got somebody sitting with me and he wants his money. He won't leave my side unless I give him his money." (Pl.'s Ex. 5.) Defendant responded that his "boy" was going to get Sadiq "ten right away" and that Defendant was "coming back right now . . . I'll be there in the afternoon." (*Id.*) Sadiq asked Defendant if Defendant was going to have "some papers" for him. (*Id.*) Defendant replied "yeah" and told Sadiq, "I'm sitting on here . . . one point five." (*Id.*) Detective Tsourillis testified that to drug investigators the term "sitting on" is known to be a common term meaning that "they're holding narcotics or money or some form of contraband in their possession." (12/13/06 Tr. at 77.)

Based on this conversation, as well as Sadiq's and Defendant's earlier telephone conversations and the previous intelligence they had gathered during their investigation, the Canadian authorities concluded that Defendant was in the Sterling Heights area in order to pick up money for drugs. (*Id.* at 76.). They conveyed this information to the U.S. surveillance team and a plan was formulated to stop Defendant when he left the

5

Marriott hotel. (*Id*. at 75-76.) However in order to avoid compromising the Canadian investigation, a decision was made to engage the assistance of an officer working road patrol in the Sterling Heights Police Department to conduct a routine traffic stop of Defendant's vehicle. (*Id*. at 75.)

At approximately 3:00 p.m. on April 4, Sterling Heights Police Officer Mark Johnson was advised by his dispatch to meet Detective Sergeant Reese of the Sterling Heights Narcotics Unit in an area near the Marriott hotel. (*Id*. at 7.) At the time, Officer Johnson was working road patrol in the department's traffic division. (*Id*. at 6.) When they met, Detective Sergeant Reese informed Officer Johnson that the department was working in conjunction with the DEA and that they had a man under surveillance in a nearby hotel. (*Id*.) Detective Sergeant Reese told Officer Johnson that wire information indicated that the man was carrying 1.5 million in money and/or drugs and that he was a key player in narcotics trafficking. (*Id*. at 7-8.) Detective Sergeant Reese further advised Officer Johnson that they anticipated that the man would be leaving the hotel in a blue Grand Prix and they wanted Officer Johnson "to make a stop on the vehicle." (*Id*. at 7 & 10.) According to Officer Johnson, Detective Sergeant Reese instructed him to try and establish his own probable cause to stop and search Defendant's car but that "under no circumstances" should he "let the car go," even if he was unable to establish his own probable cause, because they had probable cause from the wiretap to justify the stop and search. (*Id*.) Detective Sergeant Reese then provided Officer Johnson with a hand-held radio in order to monitor the surveillance of Defendant. (*Id*. at 9.)

At about 4:44 p.m., the surveillance team indicated that Defendant was getting into his vehicle. (*Id.*) Shortly thereafter, Officer Johnson located and began following Defendant's Grand Prix. (*Id.* at 10-11.) According to Officer Johnson, he then observed Defendant make two illegal lane changes– i.e. changing lanes without signaling– and that he paced Defendant's speed at 60 m.p.h. in a 45 m.p.h. zone. (*Id.*) As both vehicles approached the next intersection, Officer Johnson activated his overhead lights. (*Id.* at 12.) Officer Johnson observed Defendant's brake lights come on and then saw Defendant moving inside his vehicle "as if he was trying to reach behind the seat." (*Id.*) Immediately thereafter, Defendant pulled over into the left turn-around lane. (*Id.* at 13.) At that point, Officer Johnson called out the traffic stop to his dispatcher and requested back-up due to Defendant's movements towards the backseat. (*Id.*)

Officer Johnson exited his patrol car and approached Defendant's vehicle, advising Defendant as he did so to put his hands on the steering wheel. (*Id.* at 14.) Officer Johnson then informed Defendant that he was stopped for an improper lane change and speeding. (*Id.*) After obtaining the rental papers for the Grand Prix, Officer Johnson returned to his patrol car and waited for his back-up to arrive. (*Id.*)

After another patrol car arrived, Officer Johnson instructed Defendant to step out of his car. (*Id.* at 17.) When Defendant complied, Officer Johnson patted him down for weapons and then handed him to one of the other officers. (*Id.*) Officer Johnson next searched the passenger compartment of Defendant's vehicle which disclosed nothing. (*Id.*) However Officer Johnson found a small overnight bag sitting on the back seat in

7

which he found what appeared to be a marijuana cigarette. (*Id*.)

As a result, Defendant was placed under arrest for possession of marijuana. The officers then conducted an inventory search of his vehicle. (*Id*. at 18-19.) Inside two duffels bags located in the trunk of the car, the officers discovered 41 kilograms of cocaine. (*Id*. at 19.)

## The Parties' Arguments

The Government presents two theories to support Officer Johnson's stop and search of Defendant's vehicle on April 4, 2006. First, the Government maintains that the collective knowledge of the officers based on the Canadian investigation and the surveillance of Defendant from April 3-4, indicated that Defendant was involved in laundering drug proceeds for Sadiq's organization and that he was in possession at the time of 1.5 million in cash or drugs. Second, the Government argues that there was probable cause to stop and search Defendant's car based on Officer Johnson's observation of Defendant's traffic violations and Defendant's subsequent movements inside the vehicle suggesting that he may carrying a weapon. Defendant presents the following arguments in response to the Government's theories.

As to the Government's first theory, although recognizing that probable cause can be based on the collective knowledge of the officers involved in an investigation, Defendant argues that the collective knowledge rule does not apply here because Officer Johnson lacked a direct investigative relationship with the investigating officers. Defendant further argues that evidence obtained via the Canadian wiretap and any

evidence derived therefrom should be suppressed because the wiretap order was improperly issued under Canadian law and offends Fourth Amendment principles. Lastly Defendant argues that even if the Canadian wiretap was lawful, the intercepted conversations did not provide probable cause for the stop and search of his car.

With respect to the Government's second theory, Defendant challenges Officer Johnson's veracity. Defendant argues, and he testified, that he neither committed the alleged traffic violations nor made the purported movements inside his vehicle after Officer Johnson activated his overhead lights. The Court finds it unnecessary to resolve this credibility determination because it concludes that the Government's first theory supports a finding of probable cause.

## Analysis

In determining whether there was probable cause to stop and search Defendant's vehicle on April 4, 2006, this Court must look at the facts and circumstances known to the officers at the time of the search. *United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir. 1994). The United States Supreme Court has described the term "probable cause" as follows:

> Probable cause is a flexible common sense standard. It merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A practical nontechnical probability that incriminating evidence is involved is all that is required.

9

*Texas v. Brown*, 460 U.S. 730, 742, 103 S. Ct. 1535, 1543 (1983)). Stated differently, "the establishment of probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *United States v. McClain*, 430 F.3d 299, 305 (6th Cir. 2005)(quoting *Illinois v. Gates*, 426 U.S. 213, 243 n.13, 103 S. Ct. 2317, (1983)). Whether probable cause exists is determined by the totality of the circumstances from a law enforcement officer's perspective. *Illinois v. Gates*, 462 U.S. at 238, 103 S. Ct. at 2332 (1983).

Detective Sergeant Reese instructed Officer Johnson to stop and search Defendant's vehicle, even if Officer Johnson was not able to establish his own probable cause for doing so, because Sterling Heights officers and DEA agents investigating Defendant had sufficient information to establish probable cause. The Sixth Circuit has held that "[w]hen a superior officer orders another officer to make an arrest, it is proper to consider the superior's knowledge in determining whether there was probable cause." *United States v. Woods*, 544 F.2d 242, 260(6th Cir. 1976). The court likewise explained in *Woods* that "when a group of agents in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be considered in determining probable cause, not just the knowledge of the individual officer who physically effected the arrest." *Id*. Moreover, as the Supreme Court suggested in *United States v. Hensley*, police officers called upon to aid other officers in executing arrest warrants certainly must be entitled to assume that the officers requesting aid have probable cause to make the arrest and, so long as the requesting

officers do, the arrest will be lawful. 469 U.S. 221, 231, 105 S. Ct. 675, 681 (1985)(citing *Whiteley v. Warden*, 401 U.S. 560, 568, 91 S. Ct. 1031, 1037 (1971)). Therefore, if the collective knowledge of the Canadian and American officers was sufficient to establish probable cause to believe that Defendant was in the United States in order to engage in some type of illegal monetary transaction, the Court concludes that Officer Johnson's stop and search of Defendant's vehicle at the direction of the investigating officers was lawful.

The Court believes that the investigating officers' knowledge was sufficient to establish probable cause of Defendant's illegal activities. While Defendant's intercepted statement that he was "sitting on here . . . one point five" may not have been sufficient, on its own, to establish probable cause, that statement taken together with the other evidence on which the officers relied contributed to the officers' belief that there was probable cause. That, however, was not the only evidence on which the officers relied. Other statements made by Sadiq and Defendant during their intercepted telephone conversations on April 3 and 4 indicated that Defendant was engaged in some type of illegal monetary exchange. (*See* Pl.'s Ex. 5.) Moreover, by April 2006, the Canadian officials had collected substantial evidence through their wiretap and visual surveillance of the targeted individuals to establish that Defendant was involved in Sadiq's group and that the group was transporting drugs and laundering money across the United States and Canadian States border. (*See id.*; Def.'s post-hearing mem. Ex. 1 & Ex. 2.) Defendant also argues, however, that the Canadian wiretap was unlawful and that, therefore, the American

11

officers could not rely on the information obtained through the wiretap to establish probable cause for his stop.

Defendant's argument is foreclosed by Supreme Court and Sixth Circuit precedent. The Supreme Court has held that the Fourth Amendment does not extend to a search conducted outside the United States which involves an alien with no substantial connections to the United States, even where the search is performed by U.S. authorities. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 261, 110 S. Ct. 1056, 1059 (1990). Although there is evidence suggesting that Defendant frequently traveled to the United States, there is no evidence that he had any substantial connections to this country. But even if Defendant had sufficient connections to the United States sufficient to distinguish this case from *Verdugo-Urquidez*, his challenge to the wiretap fails as a result of the general rule that the exclusionary rule does not apply to operations conducted by foreign governments, even if the evidence gathered in such operations is used in United States legal proceedings. *United States v. Mitro*, 880 F.2d 1480, 1482 (1st Cir. 1989)(citing *United States v. Janis*, 428 U.S. 433, 455 n.31, 96 S. Ct. 3021, 3033 n.31 (1976)("It is well established, of course, that the exclusionary rule, as a deterrent sanction, is not applicable where a private party or a foreign government commits the offending act.")); *United States v. Hawkins*, 661 F.2d 436, 455-56 (5th Cir. 1981); *see also* 33 A.L.R. Fed. 342 § 3[a] (collecting cases stating general rule). Although there are two exceptions to this general rule, neither exception applies in this case.

The two exceptions arise where (1) the foreign government's conduct is "shocking

to the conscience" or (2) where U.S. agents participated in the foreign search or the foreign government was acting as the agent of its U.S. counterpart. *Mitro*, 880 F.2d at 1482 (citing *United States v. Hensel*, 669 F.2d 18, 25 (1st Cir. 1983)). Defendant does not suggest that the first exception applies. The second exception– also referred to as the "joint venture" exception– also does not apply.

The second exception requires "substantial" involvement by U.S. agents in the search itself– as opposed to the overall investigation– and "substantial" means more than being briefed on the foreign government's plans or mere presence during the search. *See, e.g., United States v. Angulo-Hurtado*, 165 F. Supp. 2d 1363, 1371 (N.D. Ga. 2001)(citing *United States v. Behety*, 32 F.3d 503, 511 (11th Cir. 1994) and *United States v. Rosenthal*, 793 F.2d 1214 (11th Cir. 1986)). Courts have found American officers' involvement in a search conducted by foreign officers sufficient to satisfy the joint venture exception where the American officers asked or urged the foreign officers to conduct the search, provided back-up protection while the search was conducted, and/or participated in the search itself. *See, e.g., United States v. Barona*, 56 F.3d 1087, 1094 (9th Cir. 1995)(finding that American agents indicated their interest in the movement of two of the defendants, requested the wiretaps, and provided interpreter); *United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987)(finding that U.S. agents were involved daily in translating and decoding intercepted transmissions and in advising foreign agents of their relevance); *Hensel*, 699 F.2d at 25 (finding it unnecessary to decide whether the U.S. officers' involvement was sufficient to make the search a "joint venture" but finding the

following facts supportive of such a finding: U.S. agents began the search of the target ship and asked Canadian officers to join them, an American DEA agent urged Canadian officers to seize the ship if it entered Canadian waters, an American ship showed firepower and provided back-up assistance during the Canadian's boarding of the ship, the Americans provided interpreters after the boarding, and an American officer participated in a second search of the ship). The present case does not present comparable involvement by the U.S. authorities.

Project Masdinero was initiated on the Canadian side. (12/13/05 Tr. at 49.) Canadian agents sought and obtained approval to conduct electronic surveillance of Defendant and the other targets in the Canadian investigation. (12/13/06 Tr. at 49-50.) The American officers did not instruct, tell, or ask the Canadians to conduct the wiretap; nor did the Americans instruct or tell the Canadians who to wiretap, identify potential targets, or provide any financial assistance for the wiretap. (*Id*. at 50.) American officers also were not involved in the actual monitoring of the wiretap. (*Id*.) Instead, Canadian officers simply passed along information obtained via the wiretap to the Sterling Heights Police Department and the DEA when the information was relevant to the United States or when the Canadians needed assistance in understanding the information– for example, identifying a place mentioned during intercepted conversations or obtaining information to identify the subscriber of a particular cell phone number. (*Id*. at 52-53, 59-61.) This "involvement" is insufficient to invoke the "joint venture" exception to the general rule that the exclusionary rule does not apply to a search executed by foreign agents.

14

**Conclusion**

Based on the above, the Court concludes that the exclusionary rule does not apply to the Canadian wiretap and that officers from the DEA and Sterling Heights Police Department could rely on information acquired through the wiretap to establish probable cause for the stop and search of Defendant's vehicle. That information, as well as evidence acquired through the Canadian investigation, provided Canadian and American officers with probable cause to believe that Defendant was engaging in an illegal monetary transaction when he was in the United States in early April 2006. Officer Johnson could rely on the collective knowledge of the investigating officers in following Detective Sergeant Reese's instructions to execute the stop and search of Defendant's vehicle on April 4, 2006. Accordingly, there is no basis for suppressing the cocaine seized from the trunk of Defendant's automobile on that date.

Accordingly,

**IT IS ORDERED**, that Defendant's motion to suppress is **DENIED**.

s/PATRICK J. DUGGAN<br>UNITED STATES DISTRICT JUDGE

Copies to:
N.C. Deday LaRene, Esq.
Domnick J. Sorise, Esq.
Wayne F. Pratt, Esq.